## THE NETTIE SUNDBERG.

### (District Court, N. D. California. March 30, 1900.)

### No. 11,898.

1. COLLISION—STRIKING VESSEL AT WHARF—FAULT OF MOVING VESSEL.

A vessel passing a wharf in the daytime, and with plenty of sea room, which comes into collision with and injures a vessel there moored, is not exonerated from fault by the fact that the injured vessel was moored in an improper place. In such case the moving vessel must be held in fault, unless she shows that it was not in her power, by adopting any practicable precaution, to prevent the collision.

2. SAME—REGULATIONS BY STATE HARBOR BOARD—RULE OF DAMAGES.

Paragraph 27 of the regulations governing the port of San Francisco by the state harbor commissioners, which provides that "vessels, while lying across the end of any pier or wharf, will be responsible for any and all damage to themselves or to any other vessel while occupying that position," cannot be construed as prohibiting the mooring of vessels at the end of a wharf or pier, but is an attempt to prescribe the rule of damages for a collision between vessels when one is so moored, and, thus construed, is invalid, as the board is not given, by the state constitution, any legislative power, nor is it within the powers of the state to prescribe what rule of damages shall be applied in a court of admiralty in cases growing out of a collision under such circumstances.

3. SAME—VESSEL MOORED IN IMPROPER PLACE.

Where the position of a vessel moored at the end of a wharf is not such as to involve danger of collision with vessels entering or leaving the harbor if properly navigated, she cannot be held to have been moored in an improper place, so as to render her in fault for a collision caused by the improper navigation of a passing vessel.

In Admiralty. Libel to recover damages for collision.

H. W. Hutton, for libelants.

Andros & Frank, for respondents.

DE HAVEN, District Judge. Libel for damages sustained by the scow schooner Mabel and Edith, as the result of having been collided with by the schooner Nettie Sundberg, the libel alleging that such collision was caused by the negligent and improper navigation of the latter vessel. At the time of the collision the Mabel and Edith was

moored alongside the end of Folsom Street pier in the harbor of San Francisco. She had been in this position for about two hours, awaiting an opportunity to haul in by the side of the United States transport Sherman, on the north side of the pier, for the purpose of delivering coal to that vessel. The Nettie Sundberg was bound outward, and in passing the Folsom street pier collided with and cut into the offshore bow of the Mabel and Edith. The weather was clear, and the tide and wind were offshore. The Mabel and Edith is about 23 feet wide. The distance between Folsom street wharf and Goat Island—the land in the bay nearest to the wharf—is two miles, or thereabouts, giving ample room between these two points for the navigation of vessels bound in or out of the harbor, and there is nothing in the evidence which tends to explain why the Nettie Sundberg on this occasion held her course so near the end of the Folsom street pier as to come into collision with the Mabel and Edith. The collision occurred between the hours of 1 and 2 in the afternoon, and the Nettie Sundberg, with her main and fore sail set, was sailing at a speed of about six miles per hour.

1. Even if it should be conceded that the Mabel and Edith was moored in an improper place, as is contended by the claimants, there is but one conclusion to be drawn from the facts above stated, and that is that the Nettie Sundberg was in fault. Of course, a case might be presented where the fact of collision with a vessel moored in an improper place would not of itself afford satisfactory evidence of negligence upon the part of the moving vessel, but the present is not such a case. The collision, as we have seen, occurred in broad daylight, at a point where there was ample room for the Nettie Sundberg to have passed without coming in contact with the Mabel and Edith. There is nothing in the evidence to warrant the belief or supposition that the course of the moving vessel could not have been readily changed, and, this being so, the conclusion necessarily follows that the collision could not have taken place without negligence upon the part of the Nettie Sundberg, either in not having a proper lookout, which would have enabled her to have seen the Mabel and Edith in time to have avoided her, or, if she had such lookout, then in the failure to exercise due care to prevent the collision, after the latter was discovered. The fact of the collision can be accounted for upon no other theory than that the Nettie Sundberg was negligent in one or the other of the particulars just mentioned, and negligence in either constitutes a fault, for which she must respond in damages under the law as administered in courts of admiralty. The general rule is that, "whether the anchored vessel is in an improper place or not, the vessel in motion must avoid her, if practicable, and can only exculpate herself by showing that it was not in her power, by adopting any practicable precaution, to have prevented the collision." Green v. The Helen, 1 Fed. 923; The Clarita and The Clara, 23 Wall. 14, 23 L. Ed. 146; The Marcia Tribou, 2 Spr. 17, Fed. Cas. No. 9,062. The case last cited was a libel in admiralty to recover damages sustained by the sloop Diploma, arising from the fact of having been collided with by the schooner Marcia Tribou. In that case

it appeared that the sloop was anchored in Boston Harbor, and was not seen by the Marcia Tribou because there was no proper lookout on that vessel; and in delivering the opinion of the court Judge Sprague said:

"The position of the sloop is one of the most material points in this case, and upon the evidence which has been introduced I am of the opinion that she was anchored in the channel outside of the harbor master's line, in an improper place, and must be held to have been guilty of negligence in so doing. I am further of opinion that the schooner was also in fault in not avoiding the sloop, notwithstanding that she was anchored in an improper place. * * * Both parties having been in fault, by the rule of admiralty law the damages and costs are to be borne by each in equal proportions."

2. The contention is made by the claimants that the Mabel and Edith was moored in an improper place, and it becomes necessary to consider this, because, if well founded, both vessels were in fault, and under the admiralty rule the damages and costs must be equally divided between them. The Marcia Tribou, 2 Spr. 17, Fed. Cas. No. 9,062; Green v. The Helen (C. C.) 1 Fed. 916; The Clover, 1 Low. 342, Fed. Cas. No. 2,908; The Milligan (D. C.) 12 Fed. 338; The City of Macon (D. C.) 20 Fed. 159. It is not claimed that the position of the Mabel and Edith was improper in itself, as being one in which there was risk of collision with vessels coming into or going out of the harbor, if properly navigated, nor, if made, could such a claim be sustained. But the board of state harbor commissioners has, in paragraph 27 of the rules and regulations adopted by it for the port of San Francisco, provided as follows:

"Vessels, while lying across the end of any pier or wharf, will be responsible for any and all damage to themselves or to any other vessel while occupying that position."

The claimants rely upon this regulation in support of their proposition that the Mabel and Edith was moored in an improper place. By an act of the legislature of the state of California approved March 19, 1889 (St. 1889, p. 380), amending section 2524 of the Political Code, the board of state harbor commissioners is given authority to make "all needful rules and regulations not inconsistent with the laws of the state or of the United States in relation to the mooring and anchoring of vessels" in the harbor of San Francisco. It is settled that the local authorities have the right "to prescribe at what wharf a vessel may lie, and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor, and for what time, and what description of light she shall display at night to warn the passing vessels of her position, and that she is at anchor, and not under sail." The James Gray v. The John Fraser, 21 How. 187, 16 L. Ed. 108. In the case just cited it was said that such regulations "are necessary and needful for the convenience and safety of commerce." See, also, The Clover, 1 Low. 342, Fed. Cas. No. 2,908. There can be no doubt, therefore, that under its authority to make all needful rules not inconsistent with the laws of the state or of the United States in relation to the mooring and anchoring of vessels in the port of San Francisco, the board of state harbor com-

missioners would have the right to provide that no vessel shall lie across the end of any wharf. Such a regulation, if made, might be upheld as one necessary for the convenience of vessels entering and leaving the various slips in the harbor, but the regulation above quoted does not declare that vessels shall not be permitted to moor alongside the end of wharves or piers. The most natural construction of the rule is that it is an attempt upon the part of the board of state harbor commissioners to prescribe what the rule of damages shall be in case of a collision between vessels when one of them is moored at the end of a wharf, and it is only in the event of such a collision that the rule is to have any operation whatever; and, thus construed, it is invalid for any purpose. The board of state harbor commissioners is an executive body, with only executive powers. Such a board cannot, under the constitution of the state of California, exercise legislative power, and it is, therefore, without authority to prescribe penalties, or damages in the nature of a penalty, for the violation of any rule or regulation established by it. Board of Harbor Com'rs of Port of Eureka v. Excelsior Redwood Co., 88 Cal. 491, 26 Pac. 375. In addition to this, it is not within the power of the state, nor within the power of any board or body exercising authority from the state, to prescribe what rule of damages shall be applied in a court of admiralty in an action growing out of a collision between vessels under the circumstances stated in the rule above quoted, for, as was said by the supreme court in the case of The New York v. Rea, 18 How. 226, 15 L. Ed. 361, the federal courts administering the general admiralty law "can be governed only by the principles peculiar to that system as generally recognized in maritime countries, modified by acts of congress independently of local legislation." See, also, Green v. The Helen (C. C.) 1 Fed. 916. My conclusion is that the Mabel and Edith, in lying alongside the end of the Folsom street wharf, where she was collided with, did not violate the regulation of the board of state harbor commissioners above referred to; that she was without fault in the matter of the collision, and her owners are entitled to recover all the damages sustained by her as the result of such collision, and costs. The case will be referred to the United States commissioner, with directions to ascertain and report the amount of such damages.